**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) ) | Case No. 14-cv-6553 |
| v. | ) ) ) | Judge Castillo Magistrate Judge Gilbert |
| COSTCO WHOLESALE CORP. | ) ) ) | |
| Defendant. | ) | |

## COSTCO WHOLESALE CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

This is a "sexual harassment" case in which the EEOC's Charging Party admits she was never the target of *sexual* conversation, *sexual* gestures, or *sexual* touching. In fact, while Dawn Suppo alleges that Thad Thompson (a Costco member) touched her and asked her "intimate" questions, the evidence establishes that neither the touching nor the questions were sexual in nature or sexually motivated.

Summary judgment is appropriate because even when viewed in the light most favorable to the EEOC, the evidence is insufficient to establish that Suppo experienced objectively severe and pervasive sexual conduct because of sex. Moreover, the undisputed facts show that, in any event, Costco responded swiftly, firmly, timely, and appropriately when Suppo brought her concerns about Thompson to its attention. Given the lack of any conduct that meets this Court's standards for sexual harassment, and given Costco's prompt actions tailored to address Suppo's concerns, Costco is entitled to summary judgment.

## FACTUAL BACKGROUND

The material facts are set forth more completely in Costco's Local Rule 56.1 Statement and incorporated here by reference. Suppo worked at Costco's Glenview warehouse as a Front End Assistant for 15 months, from May 2010 until September 2011. (SOF ¶ 6.) She was 41-42 years old during this time. (*Id.*) Among her favorite job duties was doing "go backs" – returning merchandise to its proper location in the store. (*Id.* ¶¶ 17-18.) Given the nature of go backs, Suppo was frequently moving throughout the building in an unpredictable pattern. (*Id.*)

Suppo reported to Front End Manager Don Currier. (*Id.* ¶ 16.) Overseeing Currier was Assistant General Manager Greg West, and above him, was General Manager Kristen D'Agostino. (*Id..*) Costco maintains comprehensive anti-harassment and anti-discrimination policies, which *require* employees to report any behavior that may violate its policies. (*Id.* ¶ 7.) Costco also has an Open Door Policy, reinforcing that employees can bring concerns to any level of management. (*Id.* ¶ 8.) Suppo was trained on and understood these policies. (*Id.* ¶¶ 13-14.)

At the end of May 2010, Suppo claims a Costco member (who she now understands to be Thad Thompson) spoke to her and told her had seen her before and joked that she was "stalking" him by being in the store at the same time as him. (*Id.* ¶¶ 20-22.) She felt that Thompson began asking her "intimate questions" and bothering her. (*Id.* ¶¶ 22-23.) At the end of July / early August 2010, Suppo reported to Currier and Costco's Loss Prevention Agent, Daniro Hernandez, that Thompson had told her, "[Y]ou look scared," and that she indeed felt scared. (*Id.* ¶ 39.) In response, Currier, Hernandez, and West immediately brought Thompson into the front office to speak with him. (*Id.* ¶ 40.) They advised Thompson that he was upsetting one of their employees and that he needed to avoid all contact with Suppo. (*Id.* ¶ 41.) Thompson apologized to Suppo for having "freaked her out" and agreed to comply with the request. (*Id.* ¶ 42.) Currier and West reported back to Suppo that they had spoken with Thompson, and told her to let them

know if she had any further concerns. (SOF ¶ 43.) Currier and West also told Suppo they would keep an eye on Thompson. (*Id.* ¶ 44.)[1]

Thereafter, Currier continued to observe Thompson. (*Id.* ¶¶ 44, 50.) He never saw Thompson engage with Suppo at all, let alone engage in any inappropriate conduct. (*Id.* ¶ 52.) Suppo claims she complained about Thompson to Currier over the next 13 months. (*Id.* ¶ 50.) She cannot provide specific details of these complaints, but admits that Currier assured her he was watching Thompson. (*Id*) Suppo further admits that neither Currier nor anyone else ever witnessed Thompson engaging in inappropriate behavior. (*Id.* ¶¶ 37, 64.) And, Suppo admits she did not complain to anyone else at Costco during this time. (*Id.* ¶ 52.)

On September 1, 2011, after not seeing Thompson for "several months," Suppo believed Thompson was videotaping her in the warehouse with his phone. (*Id.* ¶¶ 53, 59.) Suppo told Thompson to leave her alone, and Thompson walked away to speak with Currier. (*Id.* ¶ 53.) Costco immediately checked video surveillance footage, but was unable see any interaction between Suppo and Thompson. (*Id.* ¶ 55.) Thompson denied videotaping Suppo. (*Id.* ¶ 63.)

Suppo did not return to work after September 1. (*Id.* ¶¶ 58, 67.) On September 3, she reported Thompson's alleged videotaping of her to the Glenview Police Department. (*Id.* ¶ 59.) The police report reflects that Thompson "never made any threats or contacted her by phone or in person (other than the casual store conversations)," and that Costco had advised Thompson to "leave her alone." (*Id*.) Suppo told the police she did not want Costco contacted. (*Id*.)

Also, on September 2, Currier spoke with Suppo by phone. (*Id.* ¶ 56.) Suppo said she did not feel safe coming to work. (*Id*.) Currier tried to make her feel more comfortable and

---

[1] On August 4, 2010, after reporting Thompson to Costco, Suppo also made a report with the Glenview Police Department. (SOF ¶ 45.) Suppo reported having seen Thompson only 7-8 times. (*Id*.) The police spoke with Thompson, who denied stalking Suppo. (*Id.* ¶ 46.) The police also instructed Thompson to avoid all contact with Suppo. (*Id*.)

3

assured her she could return to work and stay on the front end. (SOF ¶ 56.) Currier had also reported Suppo's videotaping allegations to General Manager D'Agostino. (*Id*.) As such, on September 6, D'Agostino spoke with Suppo and initiated an investigation. (*Id.* ¶ 60.) Suppo admitted to D'Agostino that she had not reported Thompson's conduct sooner because she did not want to bother anyone. (*Id.* ¶ 61.) D'Agostino suggested Suppo come back to work exclusively on the front end of the store, where she could stay, not do go-backs, and step away (into the office) if she saw Thompson approaching the registers. (*Id.* ¶ 60.) Suppo still did not feel comfortable coming into work, however. (*Id.* ¶¶ 60, 67.) Accordingly, Costco allowed Suppo to use her sick days and vacation days so that she could be paid for the days she was not at work. (*Id.* ¶ 58.) Meanwhile, D'Agostino told Thompson not to shop at the Glenview warehouse while Costco's investigation was ongoing. (*Id.* ¶ 63.) Thompson complied with this directive, but insisted that he had not done anything wrong. (*Id*.)[2]

The investigation did not substantiate Suppo's allegations. (*Id.* ¶ 64.) Suppo and Thompson provided conflicting accounts of events, and there were no witnesses to corroborate either version. (*Id*.) In fact, Thompson claimed that it was Suppo who was harassing *him.* (*Id.* ¶¶ 63-64.) Ultimately, even though the conflicting accounts prevented Costco from concluding that Thompson did anything wrong, management "trespassed" (*i.e.*, banned) Thompson from the Glenview warehouse to prevent any further issues. (*Id.* ¶ 65.) Costco informed Suppo that it concluded its investigation and that Thompson was banned from Glenview. (*Id.* ¶ 66.)

Although banned from Glenview, Thompson was allowed to shop at other Costco warehouses. (*Id.* ¶ 65.) In February 2012, while Suppo and her father were shopping at Costco's Mettawa warehouse, they had a chance encounter with Thompson. (*Id.*¶¶ 68, 70.) Thompson

---

[2] While Costco's investigation was ongoing, on September 28, 2011, Suppo obtained a "no-contact" order against Thompson in the Circuit Court of Cook County. (SOF ¶ 62.)

4

began yelling at Suppo, claiming "she is crazy" and didn't belong at Mettawa. (SOF ¶ 68.) Costco had no idea that Suppo would be shopping at Mettawa, or that Suppo and Thompson would visit the Mettawa store at the same time. (*Id.* ¶ 70.) In any event, based on Thompson's loud and disruptive behavior at the Mettawa store (*i.e.,* yelling and swearing at Costco's managers), Costco revoked Thompson's Costco membership altogether; he is no longer allowed at any Costco. (*Id.* ¶ 69.)

Suppo remained on a leave of absence from Costco until November 19, 2012, when Costco terminated her employment due to the indefinite nature of her leave. (*Id.* ¶¶ 72-73.)

## ARGUMENT

The undisputed facts make clear that Suppo was not subjected to sexual harassment. First, the EEOC lacks evidence that Thompson's actions were motivated by sex. Second, and critically, the conduct alleged is neither sufficiently severe nor pervasive to be actionable under Seventh Circuit law. And third, even if the conduct somehow met the applicable standard, the evidence shows that Costco took prompt action reasonably calculated to address Suppo's concerns when she reported them, and thus, Costco cannot be liable for any harassing conduct as a matter of law.

Additionally, it is beyond dispute that Suppo was not subjected to "egregious" working conditions that forced her to take a leave of absence. And, it is undisputed that she did not *resign* her employment. Thus, the EEOC's "constructive discharge" claim also fails.

**I. The EEOC's Sexual Harassment Claim Fails Because Suppo Was Not Exposed To Sexual Conduct, Let Alone Severe or Pervasive Sexual Conduct.**

To hold Costco liable for sexual harassment, the EEOC must show that, from the objective view of a reasonable Front End Assistant, Thompson subjected Suppo to unwelcome "sexual conduct, advances, or requests" (1) because of her sex; and (2) that were severe or

5

pervasive enough to create a hostile work environment. *See Lapka v. Chertoff*, 517 F.3d 974, 982 (7th Cir. 2008). The EEOC cannot meet either of these necessary prongs.

### A. The EEOC Lacks Evidence Linking Thompson's Conduct To Suppo's Sex.

Title VII only protects harassment based on a protected characteristic. *See Chaparro v. City of Chicago*, 47 F. Supp. 3d 767, 775 (N.D. Ill. 2014) (harassment must be "directed at the recipient on account of the recipient's gender."). Indeed, employers have a "safe harbor" where the alleged harassing conduct "is too tepid or intermittent or equivocal" to be reasonably construed as discrimination based on sex. *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1144 (7th Cir. 1997); *Saboya v. Segerdahl Grp. Graphics,* 2015 WL 1503428, at *3-6 (N.D. Ill. Mar. 27, 2015) (complaints lacked "the hallmarks of truly egregious sex harassment, such as unwelcome sexual contact, sexual solicitations or threats, or pornographic images.").

Here, the EEOC cannot establish that Thompson's interactions with Suppo were because of her sex. According to Suppo, Thompson touched her face near her eye to point out dark circles, touched her arm to point out an unhealed scar, bumped into her (with his cart or on the side of her body),[3] and *tried* to hug her twice. (SOF ¶¶ 29-34.) Thompson told Suppo she looked "scared" and allegedly asked her whether she would have breakfast, lunch or dinner with him, what her nationality was, whether she worked elsewhere, where she was from, her age, and called her by her first name.[4] (*Id.* ¶¶ 39, 23.)

Even if true, this evidence is insufficient to infer that Thompson's interactions with Suppo were because of her sex. *See e.g., Saboya*, 2015 WL 1503428, at *5 (despite plaintiff being called "bitch" and put in a "bear hug," the "handful of sexually tinged incidents" lacked

---

[3] It is unclear whether Suppo believes Thompson bumped into her intentionally. She testified that Thompson apologized for bumping into her, but also testified he did not apologize. (SOF ¶ 30.)

[4] Suppo also alleges Thompson engaged with her in other ways, *see infra*, but there is no evidence that such conduct was sexual or because of sex either.

6

any indicia that they were related to sex). And, mere speculation as to Thompson's motives will not suffice. *See Springer v. Durflinger*, 518 F.3d 479, 484-85 (7th Cir. 2008) ("collective hunch about the defendant's motives," absent other evidence, was insufficient to survive summary judgment); *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1146 (7th Cir. 1994) ("Inferences and opinions must be grounded on more than flights of fancy, speculations, hunches, intuitions, or rumors. . ."). This is significant because there is no evidence indicating Thompson was motivated by Suppo's sex or any sexual interest; indeed, Thompson denies such intentions. (SOF ¶¶ 76-77.) Accordingly, Thompson's non-sexual touching and comments do not evince actions because of sex, and the EEOC's claim fails.

### B. Thompson Did Not Engage in Severe Or Pervasive Offensive Conduct.

An unpleasant workplace does not necessarily connote a hostile environment. *See Gleason*, 118 F.3d at 1144. Indeed, courts require that the conduct complained of be objectively offensive as an important "check" to "prevent eggshell plaintiffs . . . from recovering under Title VII" for relatively innocuous conduct. *E.E.O.C. v. Int'l Profit Assoc., Inc.*, 2007 WL 3120069, at *13 (N.D. Ill. Oct. 23, 2007). Whether a work environment is objectively hostile depends on "the totality of the circumstances," including "the severity of the allegedly harassing conduct, its frequency, whether it was physically threatening or humiliating or merely offensive[.]" *Mercer v. Cook Cnty.*, 527 F. App'x 515, 520 (7th Cir. 2013). On the benign end of the spectrum are "a hand on the shoulder, a brief hug, or a peck on the cheek," though even "cruder or more intimate physical acts, such as a hand on the thigh, a kiss on the lips, or a pinch of the buttocks – may be considered insufficiently abusive to be described as 'severe' when they occur in isolation." *Bilal v. Rotec Indus.*, 326 F. App'x 949, 957-58 (7th Cir. 2009) (insufficiently severe or pervasive conduct). On the other, more serious, end of the spectrum are "forced physical contact" and touching that involves sexual body parts. *Id.* at 958.

7

The conduct alleged by Suppo clearly lies on the benign end of the spectrum. Over the course of her 15 months of work, Thompson shopped at Costco only 19 times that Suppo was working. (SOF ¶ 80.) Their interactions can be – at most – characterized as unpleasant or awkward: Thompson told Suppo she was "beautiful, exotic, and different looking;" said she looked scared (and apologized); asked her to go out with him 6 times over the course of a year; gave (or tried to give) her his business card 1-4 times; touched her eyelid area; touched her wrist; bumped into her 4 times; and "watched" her. (*Id.* ¶¶ 26-27, 30-33, 35-36, 39, 42.) Suppo does not know with specificity when these actions occurred, and admits that months went by where she did not see Thompson at all. (*Id.* ¶¶ 37, 51, 59.) Significantly, Thompson never touched Suppo's sexual body parts, never made any sexual comments or gestures to her, and never threatened her. (*See id.* ¶¶ 24, 28-29.) Considering the totality of Suppo's allegations, they do not rise to the level of objectively severe or pervasive contact that courts in this Circuit have found constitute sexual harassment.[5]

In fact, courts in this Circuit have rejected sexual harassment claims in circumstances far more egregious than Suppo alleges. *Compare Bilal*, 326 F. App'x at 957 (CEO said plaintiff's job would be easier if she had sex with him, said he wished she would quit so he could "have" her, and put a piece of chocolate from his mouth into plaintiff's mouth), *Weiss v. Coca-Cola*

---

[5] *See Avdyli v. Barnhart,* 2007 WL 57601, at *15 (N.D. Ill. Jan. 3, 2007) (co-worker asking plaintiff on a date, telling her he wanted to "f-you in the ass," and repeatedly walked by her desk was not actionable harassment); *DiCenso v. Cisneros,* 96 F.3d 1004, 1009 (7th Cir. 1996) (caressing arm and back, but not touching intimate body part, and offering to exchange sex for rent, was not harassment); *Mercer*, 527 F. App'x at 520-21 (no harassment; plaintiff was told, "go play with yourself," called "bitch" multiple times, bumped into multiple times, and shown sexually explicit graffiti); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 430-31 (7th Cir. 1995) (no harassment; supervisor called the plaintiff a "pretty girl," made grunting sounds when she wore a skirt, told her his office was not hot until she walked in, and said "all pretty girls [should] run around naked."); *compare Gleason*, 118 F.3d at 1145 (important to consider what alleged harasser did not do: "He did not invite her, explicitly or by implication, to have sex with him. He made no threats. He did not expose himself, or show her dirty pictures. He never said anything to her that could not be repeated on prime-time television.") *with* SOF ¶¶ 23-36.

*Bottling Co. of Chi.*, 990 F.2d 333, 337 (7th Cir. 1993) (no harassment where supervisor asked plaintiff for dates, "called her a 'dumb blond,' put his hand on her shoulder several times, placed 'I love you' signs in her work area, and attempted to kiss her in a bar" and at work), and *McPherson v. City of Waukegan*, 379 F.3d 430, 439 (7th Cir. 2004) (supervisor's actions–asking about plaintiff's bra color, whether he could make a "house call," and pulling back plaintiff's tank top – "were lamentably inappropriate" but not harassment), *with Lapka*, 517 F.3d at 983-84 (sexual assault was sufficiently severe to be objectively hostile), *Patton v. Keystone RV Co.*, 455 F.3d 812, 817 (7th Cir. 2006) (manager running hand up plaintiff's inner thigh, up her shorts, to her underwear was objectively severe conduct), *McPherson*, 379 F.3d at 439 (physical assault).

Suppo's allegations are more akin to those alleged in *Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir. 1998), where the plaintiff alleged that she was exposed to "ambiguous comments about bananas, rubber bands, and low-neck tops," and also claimed she was subjected to "staring and attempts to make eye contact, and four isolated incidents in which a co-worker briefly touched her arm, fingers, or buttocks." The Seventh Circuit found these allegations did <u>not</u> rise to the level of severe or pervasive conduct to withstand summary judgment. *Id.*[6] Suppo asserts similarly vague allegations. Even considering her physical touching allegations, no reasonable jury could find that Suppo was subjected to an objectively hostile work environment because of sex, as the contact she alleges is a far cry from the "physical, intimate, and forcible" contact that courts in this Circuit have found to constitute an objectively severe or pervasive work environment. *Cf. Hostetler v. Quality Dining, Inc.,* 218 F.3d 798, 808-09 (7th Cir. 2000) (conduct may be severe where co-worker inserted tongue into plaintiff's mouth and nearly

---

[6] Likewise, in *Wilkinson v. Potter*, 236 F. App'x. 892, 893 (5th Cir. 2007), the Fifth Circuit affirmed that the plaintiff failed to establish an objectively hostile work environment, despite allegations that co-worker stared at her daily, made unnecessary appearances in her work area, followed her, did not let the her pass by, and touched her arm.

9

removed her bra); *McPherson*, 379 F.3d at 439. As Suppo did not endure objectively offensive behavior of the severity or frequency necessary to sustain a sexual harassment claim, summary judgment is proper.

## II. Costco Took Reasonable, Prompt Steps To Address Suppo's Concerns.

Even if Suppo experienced an objectively severe or pervasive hostile work environment because of her sex, the EEOC's claim still fails because there is no basis to impute liability to Costco. To prevail, the EEOC must show that Costco (1) knew or should have known about the harassment; and (2) failed to take appropriate steps to remedy the harassment once it was on notice. *See Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 811-812 (7th Cir. 2001) (no liability due to adequacy of employer's response). In assessing Costco's actions, the focus is not results-oriented. Rather, the relevant inquiry is whether Costco responded in a manner calculated to stop the alleged harassment. *See Parkins v. Civil Constr.*, 163 F.3d 1027, 1036 (7th Cir. 1998) (law does not require that harassment be prevented). The gravity of the alleged harassment dictates the reasonableness of the required response. *See Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 383 (7th Cir. 2012) (graduated response to harassment allegations was reasonable, employer must "take more care . . . to protect its employees from serious sexual harassment than to protect them from trivial harassment.").[7]

Here, the undisputed evidence shows that when Suppo reported her concerns about Thompson, Costco promptly and reasonably responded in a manner calculated to ameliorate her concerns. The evidence also clearly establishes that there were periods of time during which Suppo failed to follow Costco's policies by not reporting her concerns of harassment at all,

---

[7] *See also Mink v. Barth Elec. Co.*, 685 F. Supp. 2d 914, 933 (S.D. Ind. 2010) (conclusion of a "he said-she said kind of situation" not meriting any discipline was reasonable). That Thompson was a Costco *member*, not employee, is relevant in assessing Costco's response. *See Fulmore v. Home Depot, U.S.A., Inc.*, 2006 WL 839459, at *15-16 (S.D. Ind. Mar. 30, 2006) (no liability for customer harassment).

and/or failed to advise Costco that its response was not effective. Costco cannot be liable for harassment of which it was not – could not have been – aware.

### A. When Costco Was Made Aware of Suppo's Concerns In Late July/Early August 2010, It Responded Promptly And Effectively.

Despite knowing she was required to report any concerns of harassment, Suppo admits she did not inform anyone at Costco about Thompson until late July / early August 2010. (SOF ¶¶ 13, 37-39.)[8] Suppo eventually reported to Currier and Hernandez that Thompson told her she "looked scared," which scared her. (*Id.* ¶ 39.) Critically, she did not report any threatening or sexual comments, or any physical interactions with Thompson. (*Id.*) Even so, Currier, Hernandez and West immediately spoke Thompson and instructed him to avoid all contact with Suppo. (*Id.* ¶¶ 40-41.) Thompson agreed to comply with the directive to stay away from her. (*Id.* ¶ 42.) Currier and West told Suppo that they spoke with Thompson, to let them know immediately if anything else happened, and that they would keep an eye on Thompson going forward. (*Id.* ¶ 43.) This response was eminently reasonable to address the concerns raised by Suppo at the time and to prevent any future concerns. *See Milligan*, 686 F.3d at 384 (initial instruction to have no contact with plaintiff and other student workers was reasonable).

### B. To The Extent Suppo Reported Concerns With Thompson Between August 2010 and September 2011, Costco's Responses Were Appropriate.

After raising her concerns to Currier in late July/early August 2010, Suppo cannot articulate a specific occasion on which she complained about Thompson, until September 2011. (*See* SOF ¶ 50.) During the intervening 13 months, Suppo makes vague claims that she continued to complain to Currier, but she admits Currier assured her he was watching Thompson.

---

[8] Suppo also acknowledges that there were no witnesses (ever) to her interactions with Thompson. (SOF ¶¶ 37, 52, 64.) Thus, there is no basis to infer that Costco had any actual or constructive knowledge of any problems between Suppo and Thompson before Suppo spoke with Currier in late July/early August 2010. *See Rhodes v. Ill. Dept. of Transp.*, 359 F.3d 498, 507 (7th Cir. 2004) (employer must have actual or constructive notice of harassment to incur liability).

11

(SOF ¶¶ 49-50.) Significantly, Suppo cannot articulate what specific complaints she made to Currier. (*See id*.) This is important, of course, because vague and conclusory allegations are insufficient at summary judgment. *See Lucas v. Chi. Transit Auth.,* 367 F.3d 714, 726 (7th Cir. 2004) (refusing to consider harassment allegations lacking "times, dates or places which led to [] conclusions"). Suppo also admits she did not bring any concerns about Thompson to anyone else at Costco during this 13-month period, including D'Agostino, her general manager. (*Id.* ¶ 52.).[9]

Further, Suppo acknowledges that even when she raised concerns, Costco received conflicting information from her and Thompson, with Thompson telling Costco that *she* was bothering and following *him*. (*Id.* ¶ 57.) Given the benign nature of Suppo's allegations and lack of supporting evidence, Currier's efforts to monitor Thompson were a reasonable, proportionate response to (and ongoing investigation into) Suppo's claims. *See e.g., Lapka*, 517 F.3d at 984-985 (reasonable to halt further action against alleged harasser based on insufficient evidence of improper conduct). Indeed, Currier never witnessed Thompson interacting with Suppo inappropriately, and Suppo could not identify any witness who did. (SOF ¶¶ 37, 52, 64.) Thus, Currier's response – watching Thompson – was reasonably calculated to address the concerns Suppo raised and identify any violation of Costco policy by Thompson. To the extent Suppo had other concerns during this time – about Thompson, or about perceived inaction in response to her complaints – her failure to follow Costco's harassment reporting procedures (of which she had knowledge, SOF ¶ 13) precludes Costco's liability.

---

[9] Costco's Open Door Policy specifically instructs employees that they can bring workplace concerns to any level of management, particularly where they are not satisfied with a response. To the extent Suppo was not satisfied with Currier's response, she was obligated to bring that to Costco's attention. *See Parkins*, 163 F.3d at 1038 ("A reasonable person, realizing that her complaints were ineffective, would then seek a remedy elsewhere."). (*See also,* SOF ¶ 14.)

### C. Costco Conducted a Prompt, Thorough Investigation In Response to Suppo's September 2011 Concerns, And Banned Thompson from the Warehouse.

In September 2011, when Suppo told Costco that she believed Thompson tried to videotape her with his phone, Costco again responded immediately. Costco spoke with Thompson (who denied the allegations) and also tried to substantiate Suppo's allegations by looking at video surveillance footage. (SOF ¶¶ 55, 61.) Within days of Thompson's alleged actions, D'Agostino personally began investigating Suppo's claims. That investigation included:

- speaking with Suppo;
- having the Assistant General Manager, Igor Anic, interview Thompson regarding Suppo's allegations; and
- seeking guidance from her superiors and Costco's corporate human resources personnel (including Midwest Vice President Wendy Davis).

(*Id.* ¶ 60-61.) D'Agostino also had Anic speak to Thompson and instruct him not to shop at the Glenview location while the investigation was pending. (*Id.* ¶ 61, 63.) And, in response to Suppo's concerns about being safe at work, D'Agostino spoke with Suppo about staying on the front end of the store, and not doing go-backs. (*Id.* ¶ 60.) By staying on the front end, and not walking around other parts of the warehouse by herself to re-stock items, Suppo would be constantly surrounded by other employees. (*See id.*, Ex. 15.) Thus, D'Agostino was partnering with Suppo to come up with a plan that would make Suppo feel safe. (*See id.*) Ultimately, although Costco could not determine that Thompson engaged in any improper conduct, it banned Thompson from the Glenview warehouse, effective October 4, 2011, consistent with the terms of the "no-contact" Suppo received on September 29. (*Id.* ¶¶ 62, 65.) Despite this, and the fact that the "no-contact" order preventing Thompson from coming within 200 feet of her, Suppo still did not feel comfortable returning to work. (*Id.* ¶¶ 62, 67.)

The above facts demonstrate, once again, that Costco responded promptly to Suppo's complaints, in a manner reasonably designed to prevent any future issues. Costco's actions were

13

appropriately tailored to alleviate Suppo's worries while Costco conducted its investigation. *See e.g., Lapka*, 517 F.3d at 985 (taking steps to physically separate individuals and limit contact "can make it 'distinctly improbable' that there will be further harassment."); *Hallberg v. Eat'n Park,* 1996 WL 182212, at *11 (W.D. Pa. Feb. 28, 1996) (warning customer was reasonably calculated to stop harassment, even though it was unclear whether remedial actions were effective since plaintiff did not return to work). Most importantly, even though it was unable to conclude that Thompson did anything wrong, Costco still banned him from Glenview. (SOF ¶¶ 64-65.) In doing so, it virtually eliminated any chance of Suppo encountering Thompson at her workplace again. Costco's remedial actions were entirely rational and appropriate given how Suppo's allegations unfolded. *See Milligan,* 686 F.3d at 384-85 (employer's ultimate decision to ban alleged harasser from campus was appropriate, after it became clear that earlier efforts to stop behavior were unsuccessful); *Lapka*, 517 F.3d at 985. Given its swift and firm response designed to remedy Suppo's allegations of harassment, summary judgment in Costco's favor is appropriate.

**III.     Costco Did Not Constructively Discharge Suppo as a Matter of Law.**

A "constructive discharge occurs where an employer makes an employee's working conditions so intolerable that she is forced into involuntary resignation." *Roby v. CWI, Inc.*, 579 F.3d 779, 785 (7th Cir. 2009) (insufficient evidence of constructive discharge). "[A]n employee's working conditions 'must be even more egregious than the high standard for hostile work environment[.]'" *Roney v. Ill. Dept. of Transp.*, 474 F.3d 455, 463 (7th Cir. 2007) (affirming summary judgment on constructive discharge claim). Indeed, "absent extraordinary conditions, a complaining employee is expected to remain on the job while seeking redress for Title VII violations." *Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 428-29 (7th Cir. 2004).

Here, Suppo was not compelled to resign. In fact, it is undisputed that *Costco* terminated Suppo's employment due to the indefinite nature of her leave of absence. (SOF ¶ 73.) Indeed, the EEOC itself advised Suppo that Costco had "no legal obligation to continue to hold a position open for what would be two years or longer." (*Id.* ¶ 74.) To the extent the EEOC claims Suppo was constructively discharged because she was compelled to take an indefinite leave of absence, its claim still fails. As noted *supra*, the undisputed evidence does not support that Suppo was exposed to a severe and pervasive hostile work environment. It follows, that the EEOC cannot meet the even higher burden of showing that Suppo was exposed to such "egregious" working conditions that required her to take, and remain on, a leave of absence. *See Cooper-Schut*, 361 F.3d at 428-29 (constructive discharge claim failed because whatever harassment plaintiff experienced was "mild").

Moreover, Suppo stopped coming into work before Costco completed its investigation, and did not return even after Costco banned Thompson from the warehouse. She did not give Costco's remedial actions a chance. *See id.* at 429 (claim also failed because employee quit before employer completed its investigation); *McGowan v. Palmer H. Hilton Hotel Co.*, 2000 WL 1222196, at *6 (N.D. Ill. Aug. 24, 2000) (employee who refused to return to work after investigation and remedial response did not give actions "any chance of working," dooming claim). For these reasons, the EEOC's constructive discharge claim fails as a matter of law.

## CONCLUSION

For the foregoing reasons, the EEOC's Complaint fails to raise a genuine issue of material fact for trial, and as such, Costco is entitled to summary judgment as a matter of law.

15

**DATED: September 11, 2015**                    Respectfully submitted,

                                                 COSTCO WHOLESALE CORPORATION


                                                 By: /s/ *Erin Dougherty Foley*
                                                     One of Its Attorneys

Gerald L. Pauling II
gpauling@seyfarth.com
Erin Dougherty Foley
edfoley@seyfarth.com
Sara Eber Fowler
sfowler@seyfarth.com
SEYFARTH SHAW LLP
131 South Dearborn Street, Suite 2400
Chicago, Illinois  60603
Telephone:  (312) 460-5000
Facsimile:   (312) 460-7000

# CERTIFICATE OF SERVICE

I, Erin Dougherty Foley, an attorney, do hereby certify that I have caused a true and correct copy of the foregoing **MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** to be filed with the Clerk of the Court under seal using the CM/ECF system, this 11th day of September, 2015:

    Laura R. Feldman
    Laura.Feldman@eeoc.gov
    Gregory M. Gochanour
    gregory.gochanour@eeoc.gov
    John C. Hendrickson
    john.hendrickson@eeoc.gov
    Richard John Mrizek
    richard.mrizek@eeoc.gov
    U.S. Equal Employment Opportunity Commission
    500 W. Madison, Suite 2000
    Chicago, IL  60661

                                                    */s/ Erin Dougherty Foley*
                                                    Erin Dougherty Foley