Page 1

1         IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF ILLINOIS

3                   EASTERN DIVISION

4  _____

5  EQUAL EMPLOYMENT OPPORTUNITY   )
   COMMISSION,                    )
6                                 )
             Plaintiff,           )
7                                 )
        vs.                       ) No. 14-cv-6553
8                                 )
   COSTCO WHOLESALE CORPORATION,  )
9                                 )
             Defendant.           )
10 _____

11

12          DEPOSITION UPON ORAL EXAMINATION

13                         OF

14                   MICHELE HUGHES

15 _____

16

17                     9:25 A.M.

18                  JUNE 17, 2015

19          909 FIRST AVENUE, SUITE 400

20              SEATTLE, WASHINGTON

21

22

23

24

25 REPORTED BY: LESLIE POST, CCR No. 2378



206.622.6875 | 800.831.6973
production@yomreporting.com
www.yomreporting.com

Page 14

1  A. She was a personnel specialist. Those are
2  the people that, you know, people call them from the
3  buildings with questions.
4  Q. Do you know what her current position is?
5  A. She works in some department, I don't know
6  what it's called. We're implementing a new payroll
7  system and so she helps train, things like that.
8  Q. What is your understanding as to why you
9  were contacted by Sophia, if it was Sophia that
10 initially contacted you?
11     MR. WYBENGA: Objection, calls for
12 speculation.
13     You can answer.
14 A. I think -- and this is I'm kind of piecing
15 this all together by looking at the documents, it's
16 been awhile. I think at the time they thought that
17 the employee Dawn had a restraining order, so they
18 were calling for advice about what to do with that.
19 Q. (By Mr. Mrizek) What did you do after being
20 contacted about Ms. Suppo regarding Ms.Suppo?
21     MR. WYBENGA: Again, I would restate my
22 objection on attorney-client privilege and not talk
23 about legal advice you gave to your clients.
24     You can answer the question.
25     THE WITNESS: I think I gave them legal

Page 15

1  advice.
2     MR. WYBENGA: I will instruct you not to
3  answer what legal advice you gave.
4  Q. (By Mr. Mrizek) What was the subject matter
5  of the legal advice you provided? I'm not asking for
6  the legal advice, just the subject matter.
7  A. Sure. About the restraining order.
8  Q. And besides providing advice regarding the
9  restraining order, did you do anything else with
10 respect to Ms. Suppo's situation?
11     Let me rephrase that.
12 A. Okay.
13 Q. As background, if you don't understand a
14 question, let me know. I don't want you to answer
15 questions that are unclear or convoluted, which may
16 happen.
17 A. Okay.
18 Q. You said you got a contact in September of
19 2011 regarding Ms. Suppo, correct?
20 A. Yes.
21 Q. And you believe what you did in response to
22 that contact was provide legal advice regarding the
23 restraining order, correct?
24 A. Yes.
25 Q. Did you do anything else after that initial

Page 16

1  contact besides providing advice regarding the
2  restraining order?
3  A. At some point I talked to the dad.
4  Q. Marty Suppo?
5  A. Yes.
6  Q. How did you come to speak with the dad?
7  A. I don't remember. What I think happened is
8  that he was transferred to me.
9  Q. So you believe that he contacted someone
10 else in the organization and that person referred --
11 either transferred the call or referred him to you?
12 A. Yes.
13 Q. And do you recall what Mr. Suppo told you?
14 A. Well, he was yelling.
15 Q. How many times did you speak to Mr. Suppo?
16 A. Once, I think. I think only once.
17 Q. Do you recall the approximate date of that
18 conversation?
19 A. No.
20 Q. Do you recall what he told you?
21 A. He was saying that his daughter was -- that
22 a member, which is a customer, was stalking his
23 daughter. I don't know if he used the word "stalk,"
24 but he was -- you know, he was saying that this person
25 was bothering his daughter. I think he said stalking.

Page 17

1  Q. What did you say in response?
2  A. Well, I think I -- I'm going to tell you I
3  don't remember. I think I asked for the restraining
4  order. I don't know whether he was telling me he had
5  a restraining order. At some point I learned about
6  the restraining order and I think I learned about it
7  before I spoke with him, I think.
8  Q. Anything else you recall telling him in
9  response -- during that conversation?
10 A. No. It's unusual to talk to somebody's dad.
11 Q. Do you recall anything else that he said to
12 you during that phone conversation?
13 A. No.
14 Q. Did you take any notes from that phone
15 conversation?
16 A. No.
17 Q. Did you follow up with anyone at Costco
18 regarding that conversation?
19 A. Well, at some point he sent me something --
20 he sent me paperwork.
21 Q. And was that via email?
22 A. Yes. And so I think I would have sent -- I
23 don't remember. I think I would have sent that to HR,
24 I think.
25 Q. Did you have any conversations with anyone

206.622.6875 | 800.831.6973
production@yomreporting.com
www.yomreporting.com
YOM YAMAGUCHI OBIEN MANGIO COURT REPORTING & VIDEO

Page 50

1  provided.
2   A.   Okay.
3   Q.   Have you had a chance to review this
4  document?
5   A.   Yes.
6   Q.   What is this document?
7   A.   This is -- these are pages from our employee
8  agreement.  These are some of our policies.
9   Q.   On the third page, it provide examples of
10 what could be sexual harassment.
11  A.   Yes.
12  Q.   Does "stalking" mean anything to you?
13  A.   Stalking is criminal and scary.
14  Q.   Define "stalking" in your terms, the way you
15 believe it means to you.
16  A.   Stalking would be repeated contact with a
17 person who doesn't want contact.
18  Q.   Stalking, as you understand it, would that
19 be a violation of Costco's internal anti-harassment
20 policy?
21       MS. FOLEY:  Object to the extent it calls
22 for a legal conclusion.
23       MR. WYBENGA:  Yeah, no legal conclusions.
24 You can answer about the policy, which is the
25 question.

Page 51

1   A.   It would violate the policy in a number of
2  ways.
3   Q.   (By Mr. Mrizek)  Would unwelcome, repeated
4  requests for dates be a violation of Costco's internal
5  anti-harassment policy?
6        MR. WYBENGA:  Objection, incomplete
7  hypothetical.
8        You can answer, if you can.
9   A.   It could be.
10  Q.   (By Mr. Mrizek)  And would unwelcome touching
11 be a violation of Costco's anti-harassment policy?
12  A.   It could be.
13  Q.   What about unwelcome staring, would
14 unwelcome staring be a violation of Costco's
15 anti-harassment policy?
16  A.   It could be.
17  Q.   To whom may employees raise complaints of
18 violations of the policy under Costco's policies?
19  A.   Anybody.  We have an open-door policy, so
20 they can talk to a supervisor, they can talk to their
21 GM, they can call the president, he answers his own
22 phone, HR.
23  Q.   What is Costco's policy as to how any
24 complaints should be addressed?
25       MR. WYBENGA:  Objection, vague and ambiguous

Page 52

1  as to "policy" and "addressed."
2        Answer, if you can.
3   A.   Are you talking about a sexual harassment
4  policy?
5   Q.   (By Mr. Mrizek)  Sure.  Something that would
6  potentially provoke a problem with the sexual
7  harassment policy, how under Costco's practice and
8  policies would that be addressed?
9   A.   Well, it could be addressed a number of
10 ways.  One way would be to contact HR.  One way would
11 be for the building to look into the situation on
12 their own.  They should take it seriously and they
13 should get back to the person who made the complaint.
14  Q.   Is there any -- you mentioned it can be
15 dealt with by HR or dealt with by the building on its
16 own.
17  A.   Yes.
18  Q.   Any guidance as to which path should be
19 taken?
20  A.   No.  There's -- the buildings are trained.
21 I mean, the GMs are trained and the assistant managers
22 are trained on how to handle these situations.
23 Sometimes, depending upon what the complaint is, I
24 mean, if somebody was saying that their warehouse
25 manager was sexually harassing them, then the

Page 53

1  warehouse manager shouldn't be doing the
2  investigation.  So it just depends.
3   Q.   And if either it was dealt with at the
4  building level or at the HR level, what kind of
5  response should be taken by the company to something
6  that -- an issue raised by the sexual harassment
7  policy?
8        MR. WYBENGA:  Objection, incomplete
9  hypothetical, vague and ambiguous as to "response."
10       You can answer.
11  A.   They should look into it.
12  Q.   (By Mr. Mrizek)  Does Costco's policy
13 instruct how an issue should be looked into?
14       MR. WYBENGA:  Objection, vague and ambiguous
15 as to "policy," the document speaks for itself.
16       You can answer.
17  A.   I think it gives general guidance.  Each
18 situation is different and there's all different
19 levels of allegations, things that can happen.
20       But as a base point, if somebody complains
21 about anything really, even not just sexual
22 harassment, it should -- they should look at the
23 allegation and determine, the best they can, if it's
24 true or not and make sure that the person is safe and
25 feels like they've been heard and then they should get

YOM
YAMAGUCHI OBIEN MANGIO
COURT REPORTING & VIDEO
206.622.6875 | 800.831.6973
production@yomreporting.com
www.yomreporting.com