## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | No. 14 C 6553 |
| v. | ) ) | **Chief Judge Rubén Castillo** |
| COSTCO WHOLESALE CORP., | ) ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

In this action, the Equal Employment Opportunity Commission ("EEOC") alleges that

Costco Wholesale Corp. ("Costco") violated the rights of charging party Dawn Suppo under

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (R. 1, Compl.) Presently

before the Court is Costco's motion for summary judgment, as well as Costco's motion for

additional discovery. (R. 80, Costco's Mot. for Summ. J.; R. 67, Costco's Mot. for Discovery.)

For the reasons set forth below, both motions are granted in part and denied in part.

### RELEVANT FACTS

The facts herein are undisputed unless otherwise stated. The EEOC is an agency of the

federal government, which is authorized to bring legal actions for alleged violations of Title VII.

(R. 99, Costco's Reply to Facts ¶ 3.) Costco is a warehouse club that is open to members who

pay an annual fee to shop for resale, business, and personal use. (*Id.* ¶ 4.) Suppo worked at

Costco for approximately 15 months beginning in 2009, when she was hired as a seasonal

employee. (*Id.* ¶ 6.) In May 2010, she was hired as a regular, part-time employee. (*Id.*) Suppo

worked as a Front End Assistant at Costco until September 6, 2011, when she began a leave of

absence from which she never returned. (*Id.*) In this action, EEOC alleges that Costco subjected

Suppo to a hostile work environment by permitting a customer, Thad Thompson, to harass and stalk her while she was at work. (*Id.* ¶ 1.) EEOC further alleges that Costco constructively discharged Suppo because she was forced to leave work due to the harassment. (*Id.*)

Costco maintains anti-harassment and reporting policies, which prohibit all forms of harassment and require employees to report any conduct that they consider to be harassing. (*Id.* ¶ 7.) Costco's anti-harassment policy covers conduct by customers as well as employees, and harassment or stalking by a customer is treated the same as harassment or stalking by an employee. (R. 98, Costco's Resp. to Add. Facts ¶ 2.) These policies are incorporated in Costco's employment agreement with each employee. (R. 99, Costco's Reply to Facts ¶ 7.) Each new hire receives copies of these policies during an orientation program and again each time that Costco updates its employee agreements, generally every three years. (*Id.*)

In addition to the anti-harassment policy, Costco has an "open door" policy that is designed to address problems "right away at the workplace level." (*Id.* ¶ 8.) Under this policy, employees may contact any Costco supervisor or manager to help them resolve a workplace problem. (*Id.*) If they are dissatisfied with the response, the policy permits them to contact ascending levels of management until their issue is resolved. (*Id.*) The policy also encourages employees with unresolved issues to contact Costco's corporate human resources department or ombudsman's office. (*Id.*) Costco trains all of its 200,000 employees annually on its equal employment, anti-harassment, and open door policies during what it calls "HR Month." (*Id.* ¶ 9.) This training program, referred to as the "Right Side of the Line," addresses prohibited conduct by both customers and coworkers. (*Id.* ¶¶ 9-10.) The training consists of videos, interactive discussions, and instruction that are designed to assist Costco employees in identifying and reporting conduct that could violate the anti-harassment policy. (*Id.* ¶¶ 10-11.) The training also

conveys Costco's "zero-tolerance" stance regarding harassment and retaliation in the workplace. (*Id.* ¶ 10.)

Suppo attended Costco's new-hire orientation on November 13, 2009. (*Id.* ¶ 12.) She also received and signed Costco's employee agreement and received training on Costco's anti-harassment policy on that date. (*Id.* ¶¶ 12-13.) It was communicated to her that Costco had a "zero tolerance" policy regarding harassment, and she understood that in order for Costco to enforce that policy, she had to report issues that arose. (*Id.* ¶ 13.) Suppo also received training on Costco's open door policy on the same date. (*Id.* ¶ 14.) She understood that the policy, in her words, allowed her to "talk to anybody that I wanted to and tell them there's a problem." (*Id.*) Suppo also attended "HR Month" training with her coworkers at the Glenview warehouse on May 30, 2010. (*Id.* ¶ 15.)

In her position as a Front End Assistant, Suppo reported to Front End Manager Don Currier, who in turn reported to Assistant General Manager Greg West. (*Id.* ¶ 16.) West, in turn, reported to Kristen D'Agostino, General Manager of the Glenview warehouse. (*Id.*) As a Front End Assistant, Suppo was responsible for helping members with their purchases. (*Id.* ¶ 17.) According to Suppo, the "majority" of her job was doing "go-backs," which involved returning merchandise to its proper location and assisting customers "all over the store." (*Id.*) Suppo "loved" her job and particularly enjoyed doing go-backs, because it allowed her to move around the store and interact with customers. (*Id.* ¶ 18.) Costco had no issues with Suppo's work prior to the events giving rise to this lawsuit. (R. 98, Costco's Resp. to Add. Facts ¶ 1.) West described Suppo as "very polite, cordial, respectful, [and] courteous to our members." (*Id.*)

Suppo's first interaction with Thompson occurred around the end of May or early June 2010. (R. 99, Costco's Reply to Facts ¶ 21.) According to Suppo, Thompson told her that he had

seen her before and that he did not know she worked at Costco; he asked her who the man was he had seen her shopping with at Costco, which was her father Marty Suppo ("Mr. Suppo"). (*Id.*) Thompson joked that Suppo was stalking him by being in the store at the same time as him. (*Id.* ¶ 22.) Over the next few months, Thompson and Suppo continued to have interactions when Thompson was shopping at the store. (*Id.* ¶ 23.)

In late July or early August 2010, Suppo reported to Costco's loss prevention agent, Daniro Hernandez, that Thompson had approached her in the warehouse and told her that she "look[ed] scared," which unnerved her. (*Id.* ¶ 39.) Suppo also told Hernandez that Thompson "constantly" tried to speak with her, which made her feel uncomfortable. (R. 98, Costco's Resp. to Add. Facts ¶ 11.) Hernandez reported Suppo's concerns to West and Currier. (*Id.*) Hernandez also looked at the security footage to see if it had recorded their interactions, but he could only see Suppo working and "someone speaking to her." (R. 83-6, Hernandez Dep. Tr. at 59.)

At some point after Suppo spoke with Hernandez (the evidence varies as to whether it was later that same day or a few days later), Currier, Hernandez, and West pulled Thompson aside as he was shopping at the store. (R. 99, Costco's Reply to Facts ¶ 40.) They took him to the warehouse office and explained to him that he was making Suppo feel uncomfortable. (*Id.* ¶¶ 40-41.) Thompson admitted that he told Suppo that she looked frightened, but said it "was not his intention" to make her feel scared.[1] (R. 98, Costco's Resp. to Add. Facts ¶ 12; R. 83-5, Currier Dep. Tr. at 23.) The testimony varies somewhat as to exactly what Costco managers said to

---

[1] As Thompson described this incident, he saw Suppo during an earlier shopping trip and said hello to her; she did not say anything back, which he found odd because they routinely exchanged greetings, so he said to himself, "okay, well, next time I see her, I'll, you know, make a point to say is there a problem, did I do something." (R. 83-7, Thompson Dep. Tr. at 71.) The next time he was shopping, he saw Suppo near the entrance of the store and said, "[E]xcuse me . . . I'm glad I ran into you . . . is there a problem." (*Id.*) He claims she "kind of ignored me and talked to this . . . other lady which I thought was strange." (*Id.*) He continued with his shopping, but at some point he saw Suppo again and decided to "get to the bottom of this," so he approached her. (*Id.*) When she looked up he saw that she looked frightened. (*Id.* at 72.) He said, "[O]h my God, you look scared, I'm so sorry," and "scurried off." (*Id.* at 73.) He testified that he felt "mortified" he had upset her and did not know "why the heck this woman would be scared of me." (*Id.*)

4

Thompson and what he said in return, but the parties agree that Thompson was told to avoid Suppo or at least "minimize" his contact with her. (R. 98, Costco's Resp. to Add. Facts ¶ 12; R. 83-5, Currier Dep. Tr. at 41; R. 83-6, Hernandez Dep. Tr. at 71; R. 83-4, West Dep. Tr. at 65-66.) They also agree that Currier and West followed up with Suppo to tell her about their discussion with Thompson and to advise her that if anything else happened in the future, she should let them know right away. (R. 98, Costco's Resp. to Add. Facts ¶ 12; R. 99, Costco's Reply to Facts ¶ 43; R. 83-4, West Dep. Tr. at 77.)

The following day, Currier and West advised D'Agostino what had occurred. (R. 98, Costco's Resp. to Add. Facts ¶ 13.) D'Agostino did not speak with Suppo or conduct any type of follow-up investigation because, in her view, there was "nothing to investigate." (R. 83-3, D'Agostino Dep. Tr. at 86.) She felt that her managers had handled the matter "just fine," as they "listened to the employee, spoke with the member, listened to the member, and got back to the employee and said they had addressed it and if there were any future concerns to please let them know right away." (*Id.* at 72.)

On August 4, 2010, Suppo filed a report with the Glenview police claiming that Thompson had been stalking her at work. (R. 99, Costco's Reply to Facts ¶ 45.) The police later followed up with Suppo and told her that they advised Thompson to avoid all contact with her. (*Id.* ¶ 46.) The police report noted that Thompson denied having stalked Suppo. (*Id.*) Suppo claims that West and Currier were in the room when she spoke with the police, and that afterward West "yelled" at her and told her she should be "friendly" to Thompson. (*Id.* ¶ 47.) West denies doing either of these things, and denies even knowing that Suppo had contacted the police at that point. (R. 83-4, West Dep. Tr. at 78-81.) Currier also denies knowing that Suppo contacted the police in August 2010. (R. 83-5, Currier Dep. Tr. at 26.)

Between August 2010 and September 2011, there were periods of time when Suppo did not see Thompson at all. (R. 99, Costco's Reply to Facts ¶ 51.) At other times she would see him in the store shopping. (*Id.* ¶ 48.) According to Suppo, Thompson would hide behind clothing and stare at her. (*Id.* ¶¶ 23, 48.) She claims that he "kept changing his looks" and that sometimes he wore "dark glasses" or a hat. (*Id.* ¶ 48; R. 83-1, Suppo Dep. Tr. at 314-15.) She claims that he continued to speak with her even though he had been told to avoid her, and that he repeatedly asked her "intimate questions," including where she lived, what her nationality was, how old she was, whether she worked anywhere else, whether she would "go out with him for breakfast, lunch [or] dinner," and whether she had a boyfriend. (R. 99, Costco's Reply to Facts ¶¶ 23-26.) She claims that at one point Thompson tried to guess her age, and told her that he could not tell if she was "17 or 27" because "parts of her face and body look really young while other parts of her look older." (R. 98, Costco's Resp. to Add. Facts ¶ 24.) On another occasion he allegedly touched her face below her eye, telling her that he noticed "some darkness" around her eyes. (R. 99, Costco's Reply to Facts ¶¶ 24, 32.) He also allegedly told her that he thought she looked "beautiful" and "exotic." (R. 98, Costco's Resp. to Add. Facts ¶¶ 17-18.)

During another incident, Thompson allegedly touched Suppo's wrist, telling her that he noticed some veins and a scar on her arm that did not heal. (R. 99, Costco's Reply to Facts ¶ 33.) Suppo claims that Thompson also tried to give her his business card and to hug her on two occasions, albeit unsuccessfully. (R. 98, Costco's Resp. to Add. Facts ¶ 18.) She claims that he bumped into her shopping cart with his cart and bumped into her with his body "side-to-side" approximately four times. (R. 99, Costco's Reply to Facts ¶¶ 29-31.) As the months passed, Suppo felt Thompson was getting more "aggressive," meaning that when she refused to speak

with him his face would get "red and angry" and he would "throw" his cart or turn his cart around and walk away. (R. 98, Costco's Resp. to Add. Facts ¶ 17.)

Suppo claims that she complained to Currier multiple times about Thompson's conduct between August 2010 and September 2011, but Currier's only response was that he was "watching" Thompson. (R. 99, Costco's Reply to Facts ¶ 50.) Suppo does not have the exact dates when the incidents with Thompson occurred or when she made her complaints to Currier. (*Id.* ¶¶ 49-50.) Suppo's father testified that he complained to Currier, D'Agostino, and other store employees multiple times between August 2010 and September 2011 that Thompson was still harassing his daughter. (R. 98, Costco's Resp. to Add. Facts ¶ 23.) Currier and D'Agostino both deny that they received any such complaints. (R. 83-5, Currier Dep. Tr. at 34, 46; R. 83-3, D'Agostino Dep. Tr. at 163, 179.) Currier acknowledges that he spoke with Mr. Suppo when he was shopping at the store, but claims that Mr. Suppo thanked him for taking action "to protect his daughter." (R. 83-5, Currier Dep. Tr. at 34.) West testified that although he never specifically asked Suppo if Thompson was still bothering her after the initial incident, he had regular interactions with her between August 2010 and September 2011 where he would ask her "how's it going, everything going okay," and she never identified any concerns. (R. 83-4, West Dep. Tr. at 85-86.)

Thompson, a married father of three, disputes that many of these incidents occurred as Suppo described them. (*See* R. 83-7, Thompson Dep. Tr. at 9, 60.) He claims that he never followed Suppo, never wore any disguises (although he acknowledges that he sometimes wore prescription sunglasses inside the store), never hid behind any clothing, never gave her a business card, and never asked her out on a date. (*Id.* at 20, 66-69, 95, 103-04, 224.) In his view, it "defies common sense" that he would have been hiding behind clothing racks spying on Suppo

in a large store where "there's always other people around." (*Id.* at 67.) Although he admits to having some of the conversations Suppo described, in his view their interactions were entirely innocuous; he claims that he was a frequent customer at Costco who routinely spoke with both male and female employees, and that he was merely trying to be friendly to Suppo.[2] (*Id.* at 35-40.) He claims that he did his best to avoid Suppo after Currier and West told him not to speak with her, but because Suppo was doing go-backs around the store it was "kind of like a . . . moving mine that you're trying to avoid." (*Id.* at 89.) He claims that at some point he and Suppo ran into each other inside the store and she reinitiated contact with him. (*Id.* at 89-90.) It is undisputed that Costco never received any complaints about Thompson from anyone other than Suppo. (R. 99, Costco's Reply to Facts ¶ 78.)

The interactions between Suppo and Thompson came to a head on September 1, 2011, when Suppo claims she caught Thompson videotaping her with his cell phone. (R. 99, Costco's Reply to Facts ¶ 53.) According to Suppo, she was walking past Thompson in one of the aisles and could see herself on the screen of his phone. (*Id.*) She claims that he said, "Hey, Dawn, come here." (R. 98, Costco's Resp. to Add. Facts ¶ 20.) She covered her face and told him to leave her alone. (*Id.*) He responded, "Okay, I'll leave you alone mysterious Dawn." (*Id.*) Thompson denies that he was videotaping Suppo, and claims instead that he was talking to his wife on the phone about a candy purchase. (R. 83-7, Thompson Dep. Tr. at 118-19, 224, 238-40.)

The parties agree that after this incident occurred Thompson went to check out at the front of the store, where he saw Currier. (R. 99, Costco's Reply to Facts ¶ 54.) Thompson expressed frustration to Currier and told him that "Dawn needed to drop it and get over it." (*Id.*) Currier did not understand the reference Thompson was making but he apologized to Thompson

---

[2] Thompson testified that he "felt sorry" for Suppo because she "seemed very fragile and shaky, like someone who . . . had panic issues or was just a highly nervous person perhaps." (R. 83-7, Thompson Dep. Tr. at 47.)

for his frustration and stated that he would "look into it." (*Id.*) Suppo subsequently told Currier that Thompson had been videotaping her. (R. 83-1, Suppo Dep. Tr. at 320; R. 83-3, D'Agostino Dep. Tr. at 77.) Currier had the security footage pulled to determine if he could see the interaction between Suppo and Thompson, but the area where the interaction occurred—the candy aisle—had no surveillance equipment. (R. 99, Costco's Reply to Facts ¶ 55.)

Suppo spoke with Currier the next day by phone, and Currier told her that nothing could be seen on the security footage. (*Id.* ¶ 56.) Suppo then told Currier that she did not feel safe coming to work. (*Id.*) Suppo was aware at that time that Costco was getting two different stories, and that Thompson was telling Costco managers that she was bothering him. (R. 99, Costco's Reply to Facts ¶ 57.) After September 1, 2011, Suppo began to call off work, claiming that she was afraid to report to work. (*Id.* ¶ 58.) During this period, she used her vacation time and sick leave and was therefore paid for the time she missed. (*Id.*) She did not receive any type of disciplinary action for her absences. (*Id.*) On September 3, 2011, Suppo filed a second police report alleging that Thompson was still stalking her and that he had videotaped her at work. (*Id.* ¶ 59.) The police report noted that Costco managers had told Thompson "to leave [Suppo] alone," and that "Suppo does not want Costco contacted." (*Id.*)

On September 6, 2011, Suppo spoke with D'Agostino by phone. (*Id.* ¶ 60.) According to D'Agostino, she told Suppo that if she returned to work, she could stop doing go-backs and stay at the front of the store by the registers so that she would feel safe. (*Id.*) D'Agostino claims that she also told Suppo she could step off her register and go into the office if she saw Thompson. (*Id.*) D'Agostino asked Suppo why she had not reported Thompson's conduct to her sooner, and Suppo responded that she did not want to bother anyone. (*Id.* ¶ 61.) Suppo acknowledges that she had a conversation with D'Agostino, but according to her, it was about go-backs not being

"enough of a job" and not about steps that could be taken to make her feel safe. (R. 83-1, Suppo Dep. Tr. at 322.) She denies that D'Agostino told her she could stay at the front of the store or go into the office if she saw Thompson. (*Id.* at 322-24.)

After her conversation with Suppo, D'Agostino began an investigation into the incident, including having Assistant Manager Igor Anic interview Thompson.[3] (R. 99, Costco's Reply to Facts ¶ 61.) D'Agostino also sought guidance from her regional manager, Wendy Davis, and from Costco's corporate human resources department. (*Id.*) Thompson was told to shop at a different store while Costco conducted its investigation. (*Id.* ¶ 63.) The parties dispute whether D'Agostino initiated the investigation because of Suppo's concerns or because Thompson had been calling various Costco managers to complain about Suppo and what he viewed as Costco's unfair treatment of him. (*Id.* ¶ 61.) On September 28, 2011, Suppo went to the Circuit Court of Cook County, Illinois, and obtained an order of protection against Thompson. (*Id.* ¶ 62.) She subsequently requested and was placed on an extended medical leave pursuant to Costco's

---

[3] EEOC objects on grounds of hearsay to Costco's Exhibits 14 and 15, documents prepared by Currier and D'Agostino during Costco's investigation. (*See* R. 91, EEOC's Resp. to Facts ¶ 60.) Material considered at summary judgment is objectionable only if it "cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2). It appears that both of these documents qualify as business records, *see* FED. R. EVID. 803(6), and that they could be authenticated by their authors at trial, *see* FED. R. EVID. 901. But regardless of what happened during Costco's investigation, multiple fact issues remain regarding what happened between Thompson and Suppo and Costco's response to Suppo's complaints. EEOC also objects to Exhibits 32 and 33, computer printouts showing Suppo's work schedules and Thompson's Costco shopping history for the relevant period; EEOC argues that this evidence was not properly disclosed in discovery. (*See* R. 91, EEOC's Resp. to Facts ¶¶ 79-80.) After reviewing Costco's reply, the Court is satisfied that these documents were properly disclosed. (*See* R. 99, Costco's Reply to Facts ¶ 79.) But at most these documents show that Suppo and Thompson had various opportunities to interact, and that other time passed where they did not see each other—facts that are already borne out by the testimony of the witnesses. (*See, e.g.*, R. 83-1, Suppo Dep. Tr. at 249; R. 83-7, Thompson Dep. Tr. at 229.) EEOC also objects to the Court's consideration of a letter written by an EEOC investigator during the administrative review process, in which the employee opined that Costco was not required to hold Suppo's job open indefinitely. (*See* R. 91, EEOC's Resp. to Facts ¶ 74.) It is doubtful that the employee's legal opinion would be binding on this Court. *See EEOC v. State of Ill.*, 986 F.2d 187, 190 (7th Cir. 1993) ("courts remain the final authority on issues of statutory construction and must reject administrative interpretations that are inconsistent with statutory mandate" (citation omitted)). But in any event, whether Costco was required to keep Suppo's job open indefinitely is not an issue in this case. Thus, regardless of whether these documents are considered, they do not alter the outcome of this opinion.

employment agreement, which permits employees to take at least one year of personal medical leave. (*Id.* ¶ 72.)

After completing its investigation, Costco determined that Suppo's allegations were inconclusive. (*Id.* ¶ 64.) Nevertheless, Costco notified Thompson by letter that Costco had decided it was best if he no longer shopped at the Glenview warehouse. (*Id.* ¶ 65; R. 83-27, Letter of Oct. 4, 2011.) It was suggested that he shop at the Costco warehouse in nearby Mettawa, Illiniois. (R. 83-27, Letter of Oct. 4, 2011.) On November 23, 2011, Costco provided Suppo with a "closure letter" advising her that Thompson was no longer permitted to shop at the Glenview warehouse. (R. 99, Costco's Reply to Facts ¶ 66.) The letter also asked Suppo to provide Costco with a copy of her protective order so that Costco could "review it, be familiar with its requirements, and take appropriate measures should the need arise." (*Id.*) The letter reminded Suppo that Costco prohibited retaliation and told her to let the company know if there was anything else it could do. (*Id.*)

On February 11, 2012, while Suppo was still on medical leave, she and her father were shopping at the Costco in Mettawa. (*Id.* ¶ 68.) Thompson happened to be shopping in the store at the same time, and he approached them and began yelling at Suppo, telling her that she was "crazy" and that she didn't "belong" at the Mettawa store. (*Id.*) Thompson's behavior was loud and disruptive, and he swore at several Costco employees. (*Id.* ¶ 69.) His conduct violated Costco's policies regarding member behavior, and so Davis later made the decision to terminate his Costco membership. (*Id.* ¶¶ 69-71.) Thus, Thompson is no longer a Costco member. (*Id.* ¶ 71.) Thompson was unhappy with Costco's decision to bar him from the Glenview store and its subsequent decision to revoke his Costco membership. (R. 98, Costco's Resp. to Add. Facts

¶ 33.) At various points, he threatened to sue Costco for harassing him.[4] (*See* R. 83-2, Davis Dep. Tr. at 140-41; R. 83-4, West Dep. Tr. at 94-95, 98-101.)

On September 20, 2012, Costco advised Suppo by letter that her one-year leave of absence was expiring and offered to discuss with her whether she could return to work or if she needed some additional accommodation, including additional leave. (R. 99, Costco's Reply to Facts ¶ 72.) In response, Suppo provided documentation from her health care provider, who stated that she would be unable to return to work for an additional one to two years. (*Id.*) On October 10, 2012, D'Agostino advised Suppo by letter that Costco did not provide indefinite leave as an accommodation and that it was likely Costco would have to terminate her employment. (*Id.*) On November 19, 2012, Costco terminated Suppo's employment because her need for leave appeared to be indefinite. (*Id.* ¶ 73.) However, Costco advised Suppo that she remained eligible to be rehired. (*Id.*)

## PROCEDURAL HISTORY

On August 25, 2014, EEOC filed this action on Suppo's behalf, asserting that Costco subjected her to a hostile work environment based on Thompson's harassment. (R. 1, Compl. ¶ 10.) EEOC further claims that Suppo was constructively discharged because she was forced to leave her job due to the harassment. (*Id.*) Costco moves for summary judgment on both claims. (R. 80, Costco's Mot. for Summ. J.) EEOC has filed a response objecting to the entry of summary judgment,[5] and Costco has filed a reply in support of its motion. (R. 90, EEOC's Resp. to Mot. for Summ. J.; R. 97, Costco's Reply in Supp. of Mot. for Summ. J.)

---

[4] In addition to being angry that he was banned from the Glenview store and that his membership was ultimately terminated, Thompson was upset with Costco because he believed Suppo may have improperly obtained his name and address from store records in connection with her order of protection. (R. 83-7, Thompson Dep. Tr. at 91, 111-13.) He also felt that Costco managers had been overbearing in the manner that they initially took him aside to speak with him about Suppo's concerns in August 2010. (*Id.* at 69, 85, 91, 111, 115.)

[5] EEOC initially requested that the motion for summary judgment be denied outright without formal briefing (R. 85), but the Court denied this request, (R. 89).

Also before the Court is Costco's motion for additional discovery pertaining to Suppo's mental health, which the Court took under advisement pending consideration of the motion for summary judgment. (R. 67, Costco's Mot. for Add. Discovery; R. 77, Tr. of Proceedings, July 22, 2015, at 2-4.) EEOC objects to any further discovery, whereas Costco argues that more discovery is needed to make a proper assessment of causation and damages. (*See* R. 70, EEOC's Resp. to Mot. for Add. Discovery; R. 74, Costco's Reply in Supp. of Mot. for Add. Discovery.)

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted). "A genuine dispute as to any material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Kvapil v. Chippewa County, Wis.*, 752 F.3d 708, 712 (7th Cir. 2014) (internal quotation marks and citation omitted). In deciding whether a dispute exists, the Court must "construe all facts and reasonable inferences in the light most favorable to the non-moving party." *Nat'l Am. Ins. Co. v. Artisan & Truckers Cas. Co.*, 796 F.3d 717, 723 (7th Cir. 2015) (citation omitted).

Under Rule 56, the movant has the initial burden of establishing that a trial is not necessary. *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). "That burden may be discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* (internal quotation marks and citation omitted). If the movant

carries this burden, the nonmovant "must make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* (internal quotation marks and citation omitted). The nonmovant "must go beyond the pleadings (*e.g.*, produce affidavits, depositions, answers to interrogatories, or admissions on file) to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in [their] favor." *Id.* (internal quotation marks and citation omitted). "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement." *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). Rather, the nonmoving party must provide evidence from which a reasonable jury could find in its favor. *Id.* Not every factual dispute will defeat summary judgment; "[o]nly disputes that could affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citation omitted).

In deciding a motion for summary judgment, the Court cannot weigh conflicting evidence, assess the credibility of the witnesses, or determine the ultimate truth of the matter, as these are functions of the jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704-05 (7th Cir. 2011). Thus, "summary judgment cannot be used to resolve swearing contests between litigants." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Instead, the Court's role is simply "to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Anderson*, 477 U.S. at 249).

## ANALYSIS

## I.      Motion for Summary Judgment

EEOC raises two claims in this action: that Costco subjected Suppo to a hostile work environment because of Thompson's harassment, and that Costco constructively discharged her

when she left her job due to its failure to remedy the harassment. (R. 1, Compl. ¶ 10.) Costco seeks summary judgment on both claims. (R. 80, Costco's Mot. for Summ. J.)

## A.    Hostile Work Environment

Title VII prohibits employers from discriminating against employees because of their "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "Title VII protects not just tangible employment actions but also evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment." *Hall v. City of Chi.*, 713 F.3d 325, 330 (7th Cir. 2013) (quoting *Meritor Savs. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)) (internal quotation marks omitted). "Consequently, the statute protects employees against a hostile work environment so permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)) (internal quotation marks omitted). To prevail on a hostile work environment claim, the plaintiff must establish that she was subjected to conditions that were either "severe or pervasive" and that were "both objectively and subjectively offensive." *Passananti v. Cook Cty.*, 689 F.3d 655, 664 (7th Cir. 2012).

The Court should consider the totality of the circumstances, "including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (quoting *Harris*, 510 U.S. at 23 (internal quotation marks omitted)). This is a fact-intensive inquiry:

> On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures;

pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers.

*EEOC v. Mgmt. Hospitality of Racine, Inc.*, 666 F.3d 422, 432 (7th Cir. 2012) (citation omitted). The Court must determine whether the work environment was "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Id.* (citation omitted). "[C]onduct that is not particularly severe but that is an incessant part of the workplace environment" can satisfy the standard. *Jackson v. Cty. of Racine*, 474 F.3d 493, 499 (7th Cir. 2007). On the other hand, "isolated incidents, unless extremely serious, will not support a hostile work environment claim." *Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 648 (7th Cir. 2011) (citing *Faragher,* 524 U.S. at 788 (internal quotation marks omitted)); *see also Adusumilli v. City of Chi.*, 164 F.3d 353, 361 (7th Cir. 1998) ("[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." (internal quotation marks and citation omitted)). The fact that harassment "involves touching" as opposed to merely verbal conduct "increases the severity of the situation." *Worth v. Tyer*, 276 F.3d 249, 268 (7th Cir. 2001).

The Court must also find a basis to impose liability on the employer. *Passananti*, 689 F.3d at 664. Employers are held strictly liable for harassment inflicted by supervisors, but if the harassment is committed by someone other than a supervisor—whether it be "an employee, independent contractor, or even a *customer*"—a negligence standard applies. *Erickson v. Wisc. Dep't of Corr.*, 469 F.3d 600, 604-05 (7th Cir. 2006) (emphasis added). To meet this standard, the plaintiff must show that the employer was "negligent either in discovering or remedying the harassment." *Jajeh v. Cty. of Cook*, 678 F.3d 560, 569 (7th Cir. 2012). An employer is not considered to be on notice of the harassment "unless the employee makes a concerted effort to inform the employer that a problem exists." *Id.* (citation omitted). If the employer took "prompt

and appropriate corrective action reasonably likely to prevent the harassment from recurring," the employer cannot be held liable. *Id.* (citation omitted).

Upon review of the record, it is apparent that this case presents the proverbial "swearing contest." By Costco's account, it found itself in a very difficult situation: a customer and an employee providing vastly different accounts of incidents that the employee found upsetting; the customer threatening legal action based on what he perceived as unfair treatment stemming from Costco's efforts to remediate the situation; and an inability to confirm or refute the employee's allegations through surveillance video, eyewitnesses, or other independent means. But it is Suppo's account that must be accepted at this stage, and she claims that she was subjected to harassing behavior by a customer for more than a year, including ominous staring, unwanted physical touching, unwanted requests for dates, and overly intrusive personal questions. (R. 99, Costco's Reply to Facts ¶¶ 23, 26, 34, 48, 51; R. 98, Costco's Resp. to Add. Facts ¶ 17.) According to Suppo, Thompson's insistence on interacting with her continued to escalate, even though he had been counseled by Costco managers and Glenview police to avoid her. (R. 98, Costco's Resp. to Add. Facts ¶ 17.) These events culminated in Thompson allegedly videotaping Suppo without her permission and her obtaining an order of protection against him in court. (R. 99, Costco's Reply to Facts ¶ 53, 62.)

It may be that Suppo is mischaracterizing these events, or that she overreacted or misinterpreted them, but weighing the evidence and determining the credibility of witnesses are functions of the jury, not this Court. *See Omnicare*, 629 F.3d at 704-05. If the incidents occurred as Suppo described them, a reasonable jury could conclude that, added together and given the length of time over which they allegedly occurred, they rose to the level of a hostile work environment. *See, e.g., Frazier v. Delco Elecs. Corp.*, 263 F.3d 663, 668 (7th Cir. 2001)

(questions of fact precluded summary judgment because a jury could find that harasser's stalking and "crazy, hostile behavior . . . was sufficiently ominous to make the workplace intolerable even to a person of average steadfastness"); *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 694 (7th Cir. 2001) (reversing summary judgment because "[w]hile none of these incidents were particularly severe, they are sufficiently pervasive, and they seem to have unreasonably interfered with [plaintiff's] ability to do her job"); *Savino v. C.P. Hall Co.*, 988 F. Supp. 1171, 1187 (N.D. Ill. 1997) (denying summary judgment for the defendant where reasonable jury could find that the plaintiff was subjected to hostile work environment based on harasser's "frequent staring and stalking (both on and off the job), and the repeated dinner and lunch invitations, culminating in [the harasser's] act of blocking [plaintiff's] exit from their office while stating 'we'll go out to dinner tonight'").

Costco makes much of the fact that Thompson disavows any sexual interest in Suppo (*see* R. 81, Costco's Mem. at 1, 6-7), and it is true that EEOC must show that the harassment was "sufficiently connected" to Suppo's gender for it to be actionable under Title VII. *Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004); *see also Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 863 (7th Cir. 2005) (holding that "not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee" possesses a protected characteristic). But by Suppo's account, Thompson repeatedly stared at her, commented on her body, told her she was beautiful, touched her face, tried to hug her, and asked her out on dates multiple times; although Thompson claims he was friendly with everyone, there is nothing to suggest that he engaged in this type of behavior with male Costco employees. *See Frazier*, 263 F.3d at 667 (reversing summary judgment for employer even though there was "no evidence that [the harasser] had a sexual or romantic interest in [the

plaintiff]," because the Court found it "difficult to imagine a man treating another man the way [the harasser] treated [the plaintiff]" ); *Haugerud*, 259 F.3d at 692 ("Harassment is not limited to acts of sexual desire . . . but rather is a broad term which encompasses all forms of conduct that unreasonably interfere with an individual's work performance or create an intimidating, hostile, or offensive working environment." (internal quotation marks and citations omitted)). At a minimum, a dispute exists as to whether the alleged harassment was motivated by the fact that Suppo is a woman. *See Hall v. City of Chi.*, 713 F.3d 325, 334 (7th Cir. 2013) (reversing summary judgment for defendant where evidence "arguably" suggested a connection between the harassment and plaintiff's gender); *Passananti*, 689 F.3d at 665 (reversing summary judgment for defendant where reasonable jury could conclude that harasser's demeaning language was based on plaintiff's gender).

There are also factual disputes surrounding Costco's knowledge of these incidents and its efforts to take remedial action. Costco promptly spoke with Thompson when Suppo first brought this issue to the attention of her managers, and the conversation they had with him (even accepting EEOC's version) seems a reasonable response under the circumstances. (*See* R. 98, Costco's Resp. to Add. Facts ¶ 12.) But Suppo claims that she repeatedly told Currier after this incident that Thompson was still bothering her, and Currier did nothing other than to tell her he was watching Thompson, which she claims was wholly ineffective. (*See* R. 99, Costco's Reply to Facts ¶ 50.) Suppo's father also testified that he told both Currier and D'Agostino multiple times between August 2010 and September 2011 that Thompson was still harassing Suppo, and yet the harassment continued. (*See* R. 98, Costco's Resp. to Add. Facts ¶ 23.) A reasonable jury could conclude that alerting two management-level employees constituted a "concerted effort" to advise Costco of the harassment, particularly where Suppo claims that another manager (West)

angrily rebuffed her and told her to be friendly to Thompson after she contacted the police. *Jajeh*, 678 F.3d at 569; *see also Mgmt. Hospitality of Racine*, 666 F.3d at 437 (upholding jury verdict for plaintiff because "a rational jury could have believed that [plaintiff] did not feel comfortable" reporting the harassment based on employer's harsh reaction to an earlier complaint and failure to take remedial action). West denies yelling at Suppo or making this statement, and Currier and D'Agostino both deny that they received any complaints from either Suppo or her father between August 2010 and September 2011. (R. 83-4, West Dep. Tr. at 78-81; R. 83-5, Currier Dep. Tr. at 34, 46; R. 83-3, D'Agostino Dep. Tr. at 163, 179.) But deciding what actually happened is the function of a jury, not this Court. *See Omnicare*, 629 F.3d at 704-05.

There are also factual disputes surrounding what steps Costco took to make Suppo feel safe so that she could return to work in September 2011. D'Agostino testified that she talked to Suppo about working exclusively up by the registers, also telling her that she could step into the office whenever she saw Thompson. (*See* R. 99, Costco's Reply to Facts ¶¶ 60-61.) These appear to be reasonable solutions, but Suppo disputes that these options were conveyed to her. (*Id.*; R. 83-1, Suppo Dep. Tr. at 322-24.) Suppo acknowledges that D'Agostino talked to her about not doing go-backs anymore, but she claims this was not related in any way to Thompson but was instead part of a conversation about go-backs not being "enough of a job." (R. 83-1, Suppo Dep. Tr. at 322.) The record shows that Costco tried to defuse the situation by banning Thompson from the Glenview store, but this information was not conveyed to Suppo until November 2011, after she had already gone on medical leave. (*See* R. 99, Costco's Reply to Facts ¶ 66; R. 83-28, Letter of Nov. 23, 2011.) By Suppo's account, Costco did not take this step until after she had been subjected to harassment by Thompson for more than a year, which a jury could rationally

conclude was an unreasonable period of time. (*See* R. 99, Costco's Reply to Facts ¶¶ 23-51; R. 98, Costco's Resp. to Add. Facts ¶¶ 17-23.)

Based on the record, the Court cannot conclude as a matter of law that Costco took reasonable steps to end the alleged harassment. *See Mgmt. Hospitality of Racine*, 666 F.3d at 436 (summary judgment could not be granted due to employer's delay in taking action to end the harassment); *Carr v. Allison Gas Turbine Div., Gen. Motors Corp.*, 32 F.3d 1007, 1009 (7th Cir. 1994) (employer can be held liable where the evidence establishes that it "knows or should have known that one of its female employees is being harassed, yet it responds ineffectually"); *EEOC v. Walsh Constr. Co.*, No. 03 C 3601, 2006 WL 2524140, at *5 (N.D. Ill. Aug. 30, 2006) (court could not conclude as a matter of law that employer's response to harassment was reasonable where the harasser was able to resume his conduct even after the employer took remedial action). For these reasons, Costco's request for summary judgment on the hostile work environment claim is denied.

### B. Constructive Discharge

EEOC's remaining claim is that Suppo was constructively discharged from her position at Costco because of the harassment by Thompson. (R. 1, Compl. ¶ 10.) Costco argues that this claim fails as a matter of law. (R. 81, Costco's Mem. at 14-15.) To prevail on a claim for constructive discharge, the plaintiff must show "that he was forced to resign because his working conditions, from the standpoint of the reasonable employee, had become unbearable." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). The Seventh Circuit sets a high bar to establish a constructive discharge claim, because "employees are generally expected to remain employed while seeking redress." *Id.* Thus, the alleged working conditions must be "even more egregious than that required for a hostile work environment claim." *Id.* The Seventh Circuit

recognizes two forms of constructive discharge: "In the first form, an employee resigns due to alleged discriminatory harassment." *Id.* In the second form, the employee resigns in the face of an imminent termination by the employer—in other words, where the "handwriting was on the wall and the plaintiff quit just ahead of the fall of the axe." *Id.* at 680 (internal quotation marks and citation omitted).

Both of these scenarios have one thing in common: they involve an employee *resigning*. There are many factual disputes in this case, but one fact that is not in dispute is that Suppo never resigned. Instead, the record shows that she stopped reporting to work, was placed on an extended medical leave, and was ultimately terminated after her medical leave ran out. (R. 99, Costco's Reply to Facts ¶¶ 72-73; R. 83-29, Letter of Jan. 18, 2012; R. 83-36, Letter of Nov. 19, 2012.) EEOC does not dispute this, (*see* R. 91, EEOC's Resp. to Facts ¶ 73), and its response brief focuses primarily on whether the harassment Suppo experienced was sufficiently severe to warrant her resignation. (*See* R. 93, EEOC's Resp. to Costco's Mot. for Summ. J. at 14-15.) But this assumes that Suppo resigned, a point on which EEOC has introduced no evidence. EEOC's only direct response to Costco's argument comes in a footnote, where it argues: "Constructive discharge claims require that an employee stop working and stop earning income, not a formal resignation." (*Id.* at 15 n.4.) EEOC cites no case law in support of this proposition, and it runs directly counter to the holdings of the Seventh Circuit.

The Seventh Circuit has expressly held that a constructive discharge claim only arises when an employee actually resigns: "We can make it no plainer than to reiterate that constructive discharge refers to a situation in which an employee *is not fired but quits*." *Jordan v. City of Gary, Ind.*, 396 F.3d 825, 837 (7th Cir. 2005) (emphasis added) (internal quotation marks and citations omitted). Thus, the Circuit rejected a constructive discharge claim where the plaintiff

22

did not actually quit, but was instead "terminated because she failed to return to work as ordered after being suspended from her duties . . . for being absent without leave." *Id.* at 836-37; *see also Smith v. Bray*, 681 F.3d 888, 908 (7th Cir. 2012) (affirming summary judgment for employer on constructive discharge claim where plaintiff failed to rebut employer's evidence "showing that he was fired"); *Chapin*, 621 F.3d at 680 (rejecting constructive discharge claim by a plaintiff who "never formally resigned" and instead "just never returned to work").

These cases are determinative here. The undisputed evidence shows that Suppo did not quit; she went on medical leave and was terminated after her leave ran out. (R. 99, Costco's Reply to Facts ¶¶ 72-73; R. 83-36, Letter of Nov. 19, 2012.) If anything, the fact that Suppo requested and obtained medical leave from Costco shows a continuing employment relationship, not a resignation. *See Dvorak v. Mostardi Platt Assocs., Inc.*, 289 F.3d 479, 486 (7th Cir. 2002) (observing that placement on medical leave "is an action consistent only with continued employment"); *Curry v. City of Chi.*, No. 10-cv-7153, 2013 WL 884454, at *5 (N.D. Ill. Mar. 8, 2013) (constructive discharge claim failed as a matter of law where the plaintiff did not allege "that she resigned or quit" but rather that she "applied for and obtained short term disability benefits in which she receives 50% of her salary"); *Sraieb v. Am. Airlines, Inc.*, 735 F. Supp. 2d 837, 842 (N.D. Ill. 2010) ("[T]he Seventh Circuit has never recognized a 'constructive imposition of medical leave' as an adverse employment action.").

Even construing the facts in the light most favorable to EEOC, there is no genuine issue of material fact regarding whether Suppo resigned. Thus, Costco cannot be held liable for her constructive discharge. *See Jordan*, 396 F.3d at 837. For these reasons, summary judgment is granted to Costco on this claim.

## II.       Costco's Discovery Motion

That leaves the matter of Costco's request for additional discovery, which pertains to the sensitive issue of Suppo's mental health.[6] (R. 67, Costco's Mot. for Add. Discovery.) Costco argues that the discovery on this issue to date has been insufficient, and seeks: (1) additional information regarding Suppo's pre-employment mental health treatment; (2) further depositions of Suppo's parents to inquire into Suppo's mental health history and treatment; (3) a deposition of Suppo's current psychiatrist, Dr. Mark Gloss; and (4) an independent medical examination ("IME") of Suppo pursuant to Federal Rule of Civil Procedure 35. (*Id.* at 2.) The Court is cognizant of the thorny issues surrounding the release of this information, but in light of the record developed to date and the manner in which EEOC is litigating the issues in this case, the Court concludes that further discovery into Suppo's health is necessary.

In short, EEOC is seeking to attribute Suppo's inability to work for more than three years (from September 2011 to January 2015) entirely to Costco's failure to remedy the alleged harassment by Thompson. (*See, e.g.*, R. 93, EEOC's Resp. at 15 ("Suppo . . . was deemed incapable of working by her doctor as a result of the hostile work environment . . . ."); R. 92, EEOC's Add. Facts ¶ 38 ("Suppo attributed *all* of her pain, suffering and anxiety to being stalked by an individual at work . . . ." (emphasis added)).) At her deposition, Suppo testified in effect that she experienced significant distress and became unable to work because "Costco management did nothing to protect me." (R. 92-20, Suppo Dep. Tr. at 125.) She further testified that she was "doing great" and had "no problems at all" prior to working at Costco, and that she had to undergo treatment in September 2011 "[b]ecause of Costco." (R. 67, Ex. C, Suppo Dep.

---

[6] Many of the filings related to Costco's discovery motion have been filed under seal with this Court's permission. Given the privacy interests at stake, the Court has made every effort to avoid including unnecessary detail about Suppo's medical history in this opinion, while still articulating the reasons behind its decision. Even though these matters are sensitive, the Court must bear in mind that "[w]hat happens in the halls of government is presumptively open to public scrutiny." *In re Matter of Krynicki*, 983 F.2d 74, 75 (7th Cir. 1992).

Tr. at 98; R. 92-20, Suppo Dep. Tr. at 95.) Suppo's mother similarly attributed Suppo's need for treatment and inability to work entirely to the events at Costco. (*See* R. 67, Ex. K, Aviva Suppo Dep. Tr. at 101 ("[Y]ou can ask me whatever you want, but this is all from Costco.").)

Without treading too deeply into these confidential matters, suffice it to say that the documents before the Court reflect that Suppo has a history of significant health issues that existed long before she worked at Costco. (*See* R. 67, Ex. H, Bahuguna Dep. Tr. at 33-108; *id.*, Ex. I, Carter Dep. Tr. at 28-113.) In fairness, Costco must be given an opportunity to conduct further discovery into the impact these pre-existing issues may have had on the events giving rise to this case.

Some of the information sought by Costco is simply too remote; the Court declines to give Costco *carte blanche* to probe events that occurred when Suppo—now in her 40s—was a child or teenager. (*See* R. 67, Costco's Mot. for Add. Discovery at 2, 9.) This aspect of the motion will be denied. However, the Court agrees with Costco that information pertaining to treatment Suppo obtained at a medical facility while in her 30s is relevant to the issues in this case. (*Id.* at 2.) Even after Suppo's deposition, little is known about the nature of the problems that led to this treatment, what diagnoses were made, whether any medications were prescribed, and whether there was a recommendation for follow-up treatment. (*See id.*, Ex. C, Suppo Dep. Tr. at 27-33.) A doctor who treated Suppo after she left Costco opined that the severity of the issues indicated a need for ongoing treatment, and that there was no "cure" for the types of issues in Suppo's history. (*Id.*, Ex. H, Bahuguna Dep. Tr. at 47, 108.) However, Suppo testified that prior to working at Costco, she had not received any type of treatment for several years. (*Id.*, Ex. C, Suppo Dep. Tr. at 33, 114-15; *see also* R. 70, EEOC's Resp. to Costco's Mot. for Add.

Discovery at 2.) She testified that she did not recall anyone telling her that she needed ongoing treatment for her issues. (R. 67, Ex. C, Suppo Dep. Tr. at 115.)

Suppo also testified that an earlier trauma in her life, which apparently precipitated some of her health issues, continued to impact her as of the date of her deposition in June 2015. (*Id.* at 84.) A medical record completed after she left Costco reflects that she reported that Thompson's conduct made her feel like she was reliving her earlier trauma. (*Id.*, Ex. F, Medical Record at EO648.) One of the doctors who treated her during this period testified that he understood from his conversations with Suppo that her earlier trauma "didn't go away and that current stressors in her life exacerbated those prior symptoms for her." (*Id.*, Ex. H., Bahuguna Dep. Tr. at 45.) He identified those stressors—as conveyed to him by Suppo—as her experience at Costco as well as unrelated family issues. (*Id.* at 70-72.)

Suppo's health issues, which were untreated at the time of her interactions with Thompson, could be relevant in assessing whether she was subjected to a work environment that a "reasonable person would find hostile or abusive," or whether she misinterpreted innocent conduct because of her pre-existing issues. *Mgmt. Hospitality of Racine, Inc.*, 666 F.3d at 432 (citation omitted); *see also Daniels v. Essex Grp., Inc.*, 937 F.2d 1264, 1271 (7th Cir. 1991) (objective component of hostile work environment claim "places a check on claims for relief by the supersensitive 'eggshell' plaintiff"). They may also be relevant to assessing her reliability as a witness—a key issue in this case given the starkly different testimony of Suppo and Thompson and the dearth of independent evidence to support either account.[7] This information could also be relevant to determining whether Costco caused Suppo's injuries and, if so, the appropriate

---

[7] The testimony of Suppo's medical providers raises some concern about her ability to accurately perceive events as of the time they were treating her. (*See* R. 67, Ex. H., Bahuguna Dep. Tr. at 44; *id.*, Ex. I, Carter Dep. Tr. at 49-50.)

measure of damages.[8] *See, e.g., Merriweather v. Family Dollar Stores of Ind.*, 103 F.3d 576, 580-81 (7th Cir. 1996) (reducing emotional distress damages in Title VII case based on evidence of other stressors in plaintiff's life at the time of the harassment); *Spina v. Forest Pres. Dist. of Cook Cty.*, 207 F. Supp. 2d 764, 774-76 (N.D. Ill. 2002) (reducing jury award in Title VII case where it was "impossible to ignore—let alone quantify" the impact of other stressors on plaintiff's emotional well-being at the time of the harassment); *Puglisi v. Centerpoint Props.*, No. 05 C 6592, 2008 WL 410636, at *5 (N.D. Ill. Feb. 13, 2008) ("It is quite true that a plaintiff should not be permitted to put before the factfinder only those aspects of claimed emotional harm . . . that favor his or her position, without revealing that plaintiff already had some preexisting problems that could cast a cloud on the issue of causation.").

The Court also considers that Suppo's damages are likely to be significant, given that she is claiming a total inability to work for years because of these events. She is thus seeking far more than "garden variety" emotional distress damages, like compensation for "humiliation, embarrassment, and similar emotions," that are ordinarily at issue in a Title VII case. *See Taylor v. ABT Elecs., Inc.*, No. 05 C 576, 2007 WL 1455842, at *2 (N.D. Ill. May 14, 2007). For these reasons, the Court will permit Costco to obtain the medical records stemming from the treatment Suppo underwent in her 30s.

Suppo could not recall many of the details about where this treatment occurred, other than that it was at a medical facility somewhere in Boston. It appears that Suppo's sister, Laura Suppo Spitz, is currently the best source of information regarding the name and location of the

---

[8] For instance, one of the doctors who treated Suppo after she left Costco opined that had she sought treatment earlier, the harassment by Thompson, "whether it was real or not . . . would not have led to [the] escalation of her symptoms." (R. 67, Ex. H, Bahuguna Dep. Tr. at 99.)

facility, as she took Suppo there and was aware of the issues leading to her treatment.[9] The Court

will permit Costco to depose Spitz for the limited purpose of ascertaining the name and location

of the facility where Suppo was treated and the nature of the treatment Suppo received, to the

extent she knows. The deposition will be limited to a total of two hours, and shall be arranged

with due consideration for the convenience of the deponent. If EEOC can independently obtain

the name and location of the facility where Suppo's treatment occurred and provide it to Costco

(along with a signed release), the deposition of Suppo's sister will become unnecessary. If that

occurs, EEOC is free to request that the Court modify this aspect of the order.

The Court also finds good cause for an IME as requested by Costco. To obtain an IME,

the moving party must show that: (1) the party's mental or physical condition is in controversy;

and (2) there is good cause for the examination. FED. R. CIV. P. 35(a) (1)-(2)(A). The rule

requires a "discriminating application" by the Court in determining whether these requirements

are met. *Schlagenhauf v. Holder*, 379 U.S. 104, 118 (1964). To meet the standard, the moving

party must show more than "mere conclusory allegations of the pleadings" or "mere relevance to

the case." *Id.* Instead the Rule requires "an affirmative showing by the movant that each

condition as to which the examination is sought is really and genuinely in controversy and that

good cause exists for ordering each particular examination." *Id.*

The Court finds that Costco has met the standard for an IME in this unusual case.[10] As

explained above, additional information is needed about Suppo's long-term health issues, which

are relevant to liability, causation, and damages. Costco took the depositions of the medical

---

[9] Costco surmises that Suppo's mother may have some information about her treatment in Boston (R. 67, Costco's Mot. for Add. Discovery at 11 n.11), but the Court declines to permit a second deposition of either of Suppo's parents for the reasons stated below.

[10] In prior rulings, the Court provisionally granted the request for an IME, subject to consideration of the information that was disclosed in the depositions of Suppo and her medical providers. (*See* R. 44, Tr. of Proceedings, June 9, 2015, at 10.) At that time, EEOC only objected to the scope of the exam, not to its occurrence. (*Id.* at 2, 6.) For the reasons explained herein, the testimony at those depositions, as well as the manner in which EEOC has framed the issues in its summary judgment filings, reflect a continuing need for an IME.

providers who treated Suppo after she left Costco, but their testimony reflects that they were focused on helping her get better, not on pinning down the details of her past medical issues or the exact causes of her need for treatment in September 2011. (*See* R. 67, Ex. H, Bahuguna Dep. Tr. at 37, 83-84; *id.*, Ex. I, Carter Dep. Tr. at 109.) The record also shows that there was a gap in Suppo's treatment between October 2013 and April 2015, when she apparently stopped treatment against the advice of her medical providers. (*Id.*, Ex. I, Carter Dep. Tr. at 112.) The discovery to date thus has not allowed Costco to obtain complete information about Suppo's pre-existing issues and the impact they may have had on the events underlying this lawsuit.

EEOC believes that an IME is unnecessary because Suppo has agreed to cut off her emotional distress damages as of January 12, 2015, the date when she was "able to go back to work and live independently." (R. 70, EEOC's Resp. to Costco's Mot. for Add. Discovery at 1-2.) In EEOC's view, Costco's request for an IME has become moot because Suppo does not claim that she is still suffering emotional distress from these events. (*Id.* at 1-2, 8-10.) The Court disagrees. Even if Suppo has offered to cut off her damages as of January 2015, an IME could reveal critical information about long-term problems she was experiencing when she worked at Costco and the reasons she needed treatment after she left. It could also shed light on the point at which she became better, an issue not currently developed because of the gap in her treatment and the fact that Costco has not been permitted to depose her current doctor. Although January 2015 would be the outer date for which Suppo could obtain damages, Costco may be able to prove that Suppo recovered from the events at Costco earlier—or that her emotional distress was caused by something else altogether. The Court also considers that EEOC has expressed an

intent to call medical providers at trial in support of Suppo's damages claim.[11] (*See* R. 44, Tr. of Proceedings, June 9, 2015, at 3.) In fairness, EEOC cannot claim that Suppo was unable to work for years because of Costco's actions, and at the same time prevent discovery into other possible causes of her emotional distress.

Under these circumstances, Costco will be given an opportunity to conduct an independent assessment of Suppo's health problems and the impact they may have had on the events giving rise to this lawsuit. *See Walti v. Toys R Us*, No. 10 C 2116, 2011 WL 3876907, at *2-3 (N.D. Ill. Aug. 31, 2011) (ordering IME in light of the plaintiff's long-term history of post-traumatic stress disorder and other traumatic life events, which were relevant to the assessment of emotional distress damages in Title VII case); *Chrissafis v. Cont'l Airlines, Inc.*, No. 95 C 5080, 1997 WL 534874, at *2 (N.D. Ill. Aug. 21, 1997) (ordering IME where the plaintiff was not seeking ordinary damages for pain and suffering and instead suffered from a "specific psychiatric condition," even though plaintiff claimed she was no longer suffering from the condition); *see also Nguyen v. Qualcomm, Inc.*, No. 09-1925-MMA, 2013 WL 3353840, at *6 (S.D. Cal. July 3, 2013) (ordering IME to evaluate pre-existing causes of plaintiff's emotional distress, and noting that plaintiff could not "thwart a request for an IME by asserting that [she is] no longer suffering from emotional distress"); *Allshouse v. JBL Ltd.*, No. 3:05-CV-403-DRH, 2006 WL 517615, at *2 (S.D. Ill. Mar. 2, 2006) (ordering IME in part because "Defendant is not required to rely solely on the Plaintiff's witnesses['] assessment of her mental condition"); *EEOC v. Grief Bros.*, 218 F.R.D. 59, 63 (W.D.N.Y. 2003) (ordering IME over EEOC's objection

---

[11] The Court notes that EEOC has submitted selected records from Suppo's treatment in support of its response to the motion for summary judgment. (*See* R. 94-1, Medical Records; R. 94-2, Certification of Health Care Provider; R. 94-3, Excerpt of Bahuguna Dep. Tr.; R. 94-4, Excerpt of Mourad Dep. Tr.) With these selected records, EEOC appears to be trying to downplay the extent of Suppo's pre-existing health issues. For instance, EEOC submits an excerpt of a deposition by a doctor who evaluated Suppo after she left Costco; this doctor apparently did not know the full details of Suppo's history and therefore attributed her distress mainly to the events at Costco. (*See* R. 94-4, Mourad Dep. Tr. at 76-77.) The more complete record submitted with Costco's discovery motion reveals that Suppo's pre-existing issues were significant and long-standing.

because "whether Defendant's expert will be able to discern, four years after the fact, whether it is plausible that [plaintiff] was severely depressed during the relevant period and that such condition was or was not caused or aggravated by the alleged harassment, is a question of competency and credibility that must await trial").

The Court will also order that the IME take place in Boston, where it was previously arranged for Suppo's convenience, as she was living in Boston until recently. (*See* R. 44, Tr. of Proceedings, June 9, 2015, at 6.) After Dr. Liza Gold was retained as an expert and the details of the IME arranged, Suppo decided to move to Florida. (*Id.*) But Dr. Gold is not licensed in Florida, and conducting the IME there presents a host of logistical issues. (*Id.* at 6-7.) The Court is aware that there will be some level of inconvenience to Suppo, but principles of fairness require that she travel back to Boston for the IME. The Court will limit the IME to a total of seven hours, which may be broken up into two half-day sessions if that is Suppo's preference. The Court declines to place a limit on the scope of the IME, and it may include psychological testing by Dr. Gold's associate, Dr. David Medoff, if Dr. Gold deems that necessary. But the Court will strictly enforce the seven-hour limit, however Dr. Gold decides to use that time. The parties are directed to cooperate to ensure that the IME is completed in a timely fashion and with due consideration for the sensitive nature of the information being explored.

Costco also seeks to depose Suppo's parents a second time to question them about Suppo's health history and the "traumatic events in their daughter's life" that may have caused her emotional distress in September 2011. (R. 67, Costco's Mot. for Add. Discovery at 2, 11.) The Court has reviewed the excerpts of her parents' depositions, as well as other documents in the record outlining her family history, and finds no basis to conclude that anything fruitful would result from a second round of depositions. Costco is not being permitted to conduct

additional discovery into events from Suppo's childhood, and it does not appear that Suppo's parents have much useful information about the treatment she underwent in her 30s. Costco is being permitted to obtain the medical records from this treatment, which in the Court's view is a far better source of information. There are also other available sources of information regarding stressors in Suppo's life that may have triggered her emotional distress in September 2011, including her own deposition testimony and the IME that is being ordered. The Court must consider the inconvenience and emotional strain to these non-parties if they are required to sit for a second deposition to answer questions about these sensitive matters. Discovery efforts must be proportional, *see* FED. R. CIV. P. 26(b)(1), and the Court does not find this discovery warranted under the circumstances.

Finally, the Court does not rule out the possibility that Costco may need to take the deposition of Suppo's current doctor, Dr. Gloss.[12] Suppo testified that her long-term health issues were continuing to impact her as of the date of her deposition in June 2015, when she was under Dr. Gloss's care. (R. 67, Ex. C, Supp. Dep. Tr. at 84, 147-48, 291, 353.) As noted above, there is also a gap in her treatment between October 2013 and April 2015, when she began seeing Dr. Gloss. EEOC is seeking damages for the period June 2010 to January 2015, which overlaps in part with her gap in treatment; what was occurring during that period and what led her to seek care from Dr. Gloss could be relevant to the determination of damages. Given the sensitivity of these issues, however, the Court's continued desire is to proceed in a graduated fashion. The IME and other discovery being ordered may obviate the need to interfere with Suppo's current therapy. Based on the present record, Costco's request will be denied. But if Costco believes that it has a concrete need for Dr. Gloss's deposition after obtaining the additional discovery ordered

[12] Costco has obtained Dr. Gloss's notes, but they are largely illegible and shed little light on any diagnoses he has made or the nature of the care he is providing, other than the date and length of his visits with Suppo. (*See* R. 67, Ex. L, Gloss Notes.)

herein, it can renew its request, but it must convince the Court that the discovery conducted to date has been insufficient.

As a final matter, in light of the logistical issues involved in conducting the additional discovery ordered herein, it is apparent that the January 2016 trial date has become untenable. Reluctantly, the Court will vacate the trial date. At the next status hearing, the parties shall be prepared to pick a new trial date in the near future. The Court urges the parties to discuss an informal resolution of this case, which presents thorny and difficult issues for both sides.

## CONCLUSION

For these reasons, Costco's motion for summary judgment (R. 80) is GRANTED in part and DENIED in part. Partial judgment is entered in favor of Costco on the constructive discharge claim. Costco's motion for additional discovery (R. 67) is GRANTED in part and DENIED in part as stated herein. The trial scheduled on January 11, 2016, is VACATED. The parties are directed to reevalute their settlement positions in light of this opinion and to exhaust all efforts to settle this case. The parties shall appear on January 19, 2016, for a status hearing and shall be prepared to pick a new trial date and to report on the status of discovery efforts.

ENTERED:

**Chief Judge Ruben Castillo**
**United States District Court**

**Dated: December 15, 2015**